## EASTERN OIL CO. v. BEATTY et al.

No. 5912—Opinion Filed Nov. 12, 1918.

Rehearing Denied Dec. 31, 1918.

(177 Pac. 104.)

(Syllabus.)

**1. Oil and Gas — Lease — Consideration— Mutuality—Termination.**

An oil and gas lease on 80 acres of land for a term of 10 years, and as long thereafter as oil or gas is produced, executed for a cash consideration or bonus of $2,100, and $2,000 to be paid out of 25 per cent. of the working interest of oil produced, and which provides for a royalty to the lessee of one-eighth of the oil and a stipulated sum for each gas well, the lessee agreeing to complete a well in 9 days from date, or pay at the rate of $20 quarterly in advance for each additional three months such completion is delayed, is supported by a sufficient consideration, and is not void for want of mutuality, notwithstanding the further agreement that, upon payment of $1 at any time after giving three months' notice, the lessee should have the right to surrender the lease for cancellation, after which all payments and liabilities thereafter to accrue under and by virtue of its terms should cease and determine, and the grant become absolutely null and void; and such right given the lessee to terminate does not confer a corresponding right of termination upon the lessors.

**2. Same—Lease — Implied Covenants—Operation.**

In an oil and gas lease for a term of 10 years, and as long thereafter as oil or gas is produced, providing royalties on the oil and gas to be paid the lessor, and imposing the alternative duty on the lessee of completing a well in 90 days, or paying a sum specified in advance each additional three months such completion is delayed, there is no implied covenant for diligent operation, or operation at all, during the term of 10 years, merely because such operations may be conducted successfully and profitably to the parties. The lessor is deemed to have assented to the postponement of operations through the several periods, and bound to accept the periodical payments therefor.

**3. Same—Lease—Cancellation.**

Under such lease the lessor is not entitled to a decree of forfeiture or cancellation, or other relief, for drainage of the leased premises suffered by failure to drill offset wells during the portion of the term of 10 years, for which payments for delay in complet-

ing a well are made and accepted with knowledge of such drainage.

#### 4. Same—Failure to Drill Offset Wells—Forfeiture or Cancellation.

Assuming that under such lease an obligation to drill offset wells during the 10-year period for the protection of the premises against drainage from wells operated on adjacent lands can be implied, and that where the lessor demands that such wells be drilled, and declines to accept further payments for delay in completing the well, a cancellation or forfeiture of the lease may be decreed for failure of the lessee to do so in a reasonable time after such demand, such forfeiture or cancellation will not be decreed in circumstances where drilling such offset would not be reasonably expected of operators of ordinary prudence, having regard for the interests of both lessor and lessee, and where the lessee makes timely tender of all payments due for delay; and especially so where it reasonably appears that such offset well would not be profitable to lessee, and where it does not reasonably appear that the value of the interests of the lessor in the oil that probably could be saved from drainage by such offset well would substantially exceed the amount stipulated to be paid for delay in completing a well.

Turner, J., dissenting.

Error from Superior Court, Tulsa County; M. A. Breckinridge, Judge.

Action by Joseph W. Beatty and another against the Eastern Oil Company. Judgment for plaintiffs, and defendant brings error. Reversed and remanded.

Rowland & Talbott, for plaintiff in error.

Davidson & Williams, for defendants in error.

Burford, Robertson & Hoffman, amicus curiæ.

MILEY, J. This action was commenced in the court below on July 25, 1912, by defendants in error, as plaintiffs therein, to cancel and remove as a cloud upon their title to 80 acres of land, of which they were the owners, an oil and gas lease thereon, which they had executed and delivered on the 14th day of September, A. D. 1910, to the plaintiff in error, defendant below. There was judgment for the plaintiffs for cancellation as prayed, to reverse which this proceeding in error is prosecuted.

The lease in question was executed for a consideration or cash bonus of $2,100, paid at the time of its execution and delivered, and an additional bonus of $2,000 to be paid out of 25 per cent. of the working interest of the oil produced from said land. It was for a term of 10 years from date thereof, and as long thereafter as oil or gas, or either of them, should be produced therefrom. The lessee covenanted and agreed to pay royalties of one-eighth of all oil produced or the market price therefor, and $150 per year for the gas from each and every gas well, if the product should be marketed and used off of the premises. The lessee further agreed to complete a well on said premises within 90 days from the date of the lease, or pay at the rate of $20 quarterly in advance for each additional three months such completion should be delayed. It was agreed that the completion of a well should be and operate as a full liquidation of all rentals for delay under that provision during the remainder of the term. It was also agreed that such payments should be deposited to the credit of the lessors in the Central National Bank of Tulsa, Okla. It was further agreed that, upon the payment of $1 at any time after giving three months' notice, the lessee should have the right to surrender the lease for cancellation, after which all payments and liabilities thereafter to accrue under and by virtue of its terms should cease and determine, and the grant become absolutely null and void.

There was no material conflict in the evidence. It appears therefrom that the lessee had not commenced operations and no well was completed on the premises at the time of the trial. The lessee, however, had paid and the lessors had accepted all payments due for all quarterly periods of delay up to the quarter commencing on June 14, 1912. The lessee tendered the payment for delay for that quarter in advance, but the lessors refused to accept the same or any subsequent quarterly payments for delay. The lessee thereupon deposited the payment due for the quarter beginning June 14, 1912, and for each subsequent quarter to the credit of the lessors in the bank designated in the agreement. On September 27, 1911, the lessors notified the lessee in writing that a well had been drilled upon land adjoining the leased premises, producing oil in paying quantities, and that the same was being operated and draining the oil from beneath their land, and made demand that the lessee drill an offset well on their land, and unless this was done they would institute action for the cancellation of the lease and damages for failure to drill said well. And again on June 14, 1912, they notified the lessee that the said well on the adjoining premises was draining the oil from beneath their land, and demanded that the lessee commence an offset well on their property within the next 30 days, and continue the drilling thereof without unnecessary delay to final completion; and that, unless this

**was** done, they would declare the lease forfeited, and terminate the rights and privileges of the lessee thereunder, and would institute an action for cancellation of the lease and for damages for failure to develop and protect the property. They further notified the lessee that they would not accept any further payments for delay.

Special findings of fact and conclusions of law were not requested, and there was a general finding only for the plaintiffs, so it does not appear upon which of the several grounds urged the decree of cancellation was made.

The defendants in error in their brief insist that the judgment should be sustained upon any one of three grounds, namely: First, that the lease is "unilateral, and therefore subject to be terminated" by them; second, for breach of the implied covenant to develop the property; and, third for breach of the implied covenant to protect the premises from drainage by wells drilled upon adjacent land.

It is now well settled by previous decisions of this court that the lease, having been executed for a valuable consideration, to wit, $2,100 cash in hand, in addition to the covenant to develop and pay royalites, or to pay rentals in lieu of such development, is valid, notwithstanding the so called surrender clause, and is not subject to cancellation on the ground that the contract is unilateral and void for want of mutuality, and that the right given the lessee to terminate does not confer a corresponding right of termination upon the lessors. Northwestern Oil & Gas Co. v. Branine, 71 Okla. 107, 175 Pac. 533; Pucini et al. v. Bumgarner, 71 Okla. 105, 175 Pac. 537. Therefore the judgment of the trial court cannot be sustained upon the first ground above stated.

As to the second ground, it is sufficient to say that no covenant to develop the property can be implied in the face of an express stipulation for periodical payments for delay thereof not extending beyond a definite term. Although development on other lands in the vicinity may show the premises to be situated in oil and gas territory, and prove the adaptability of their land for successful and profitable mining operations, the lessors have no legal cause for complaint so long as they receive compensation for the delay for which they have contracted, and the operations on neighboring lands do not drain their premises. This court has never held, and, so far as we are aware, neither has any other court, that under such conditions a covenant for diligent operation, or operation at all, will be implied.

In one class of cases covenants for development have been held to arise by implication where prospective royalties were held to be the sole or a substantial part of the consideration, no provision being made in the leases for the time of beginning operations or compensation for delay. In such circumstances it has been held that operations must commence within a reasonable time and be prosecuted with diligence. In another class of cases, in which after a well had been commenced or completed, and the provision in the lease for payment for delay in commencing or completing a well, as the case may be, was no longer operative, covenants for diligent operation thereafter have been implied. In yet another class of cases, in which, although the lease provided for the time in which a well should be commenced or completed, and for payments for periodical delays, but there was no fixed term or limitation of time beyond which development may be delayed by such payments, it was held that the lessor may refuse such payments for delay and demand development within a reasonable time thereafter, and terminate the lease for failure of the lessee to comply therewith. But in no case, so far as we are advised, except, perhaps, in Indiana, where the lease is for a definite term and provides for the payment of a stipulated sum for delay during that term, and that provision is still effective, has it been held that the lessor can refuse the stipulated payments for delay and recover damages, or invoke a forfeiture for failure to develop upon demand. To do so would be violative of fundamental principles of the law of contracts. It would permit one party to the contract to demand and enforce immediate performance of that which he has agreed may be deferred. The lessor suffers no injury in consequence of his inability to compel development under such circumstances, except delay in realizing the agreed royalties upon the oil and gas produced. The oil and gas are still available for later operations, and to the delay he has solemnly assented by his contract for a compensation payable as stipulated therein.

Drainage can be prevented only by drilling offset wells, and what has been said with reference to an implied covenant to develop during the term of 10 years would seem to logically apply to an implied covenant to protect the premises from drainage by wells drilled upon adjacent land within said term, and it has been so held. Carper v. United Fuel Gas Co., 78 W. Va. 433, 89

S. E. 12, L. R. A. 1917A, 171; Stanley v. United Fuel Gas Co., 78 W. Va. 793, 90 S. E. 344. The rule announced in Brewster v. Lanyon Zinc Co., 77 C. C. A. 213, 140 Fed. 801, and adopted by this court in Ind. Oil, Gas & Development Co. v. McCrory et al., 42 Okla. 186, 140 Pac. 610, and followed in Blackwell Oil & Gas Co. v. Whitesides, 71 Okla. —, 174 Pac. 573, that a forfeiture may be decreed for breach of implied covenant of an oil and gas lease does not obtain in West Virginia, but the remedy for such breach is there held to be an action for damages. In the cases cited the Supreme Court of West Virginia held that the lessor was not entitled to recover damages for drainage suffered by reason of the failure to drill offset wells during the period covered by payments made and accepted in lieu of drilling a well, a holding which appears to us to be sound and to accord with the highest sense of justice and right. The lessor having accepted the agreed compensation for delay in operations, manifestly he should not be permitted to recover in addition thereto as damages the value of his share of the oil and gas drained from the leased premises during the time covered by such payments; the application of which to this case necessarily results in the conclusion that the lessors, having accepted the payments for delay in drilling a well up to the quarter commencing June 14, 1912, with knowledge of the fact that the land was being drained, they cannot be heard to complain of anything they may have suffered by reason of drainage prior to that time, notwithstanding the notice and demand of September 27, 1911. They accepted payments for delay subsequent to giving that notice and making that demand, and thereby clearly waived any right which they may have had to claim a forfeiture for failure to drill an offset well, and thereby protect against drainage during the time covered by the payments accepted; that is, prior to June 14, 1912.

There remains yet to be considered the right to a decree of forfeiture or cancellation by reason of the failure of the lessee to comply with the demand made on June 14, 1912, to commence an offset well within 30 days, and prosecute the same with diligence to completion, and thereby prevent further loss by drainage. The lessors, having refused to accept the payment due and tendered on that day for further delay, and adhered to the notice then given of their intention to accept no payments thereafter for that purpose, it cannot be held that they have waived any remedy they may have had on account of failure of the lessee to protect the premises against such subsequent drainage.

We have already suggested that, in view of the express provisions of the lease, it would seem doubtful if a covenant to protect the premises against drainage can be implied during the period that payment for delay in drilling a well may be made. No authority has been cited holding that may be done. However unlike the consequences which result from not implying a covenant to develop under such circumstances that the lessor can suffer no injury except delay in realizing royalties for which he is entitled to the compensation agreed upon therein, it is apparent that, unless the lessor has some right to prevent drainage during the fixed term in which the completion of a well may be delayed by making periodical payments serious loss to him may result. It is not difficult to conceive a situation arising where the consideration for the lease and the payments for delay together would be so much less than the royalties on the oil or gas lost by drainage, and which could have been secured by offset wells, that, in view of the nature of the subject matter and the purpose of the lease, it could not be said that such results were intended by the parties.

The Supreme Court of West Virginia in Carper v. United Fuel & Gas Co., supra, upon the theory that to say the lessor intended the oil and gas which might be found in his land to be withdrawn from it otherwise than through wells drilled on it under the lease, and thus let it go to other persons for nothing as an incident of his procurement of a small money rental for delay, would be inconsistent with reason and contrary to legal principles governing the relation of the parties, worked out and announced a rule which it deemed consonant with established principles and afforded means of protection to the lessor. The rule announced in that case is that there is an implied condition that, in the event of such drainage or imminent danger thereof, the lessee will, upon demand of the lessor, drill a well on the leased premises for the prevention of loss of the subject-matter of the lease within the last period for which delay rental has been or shall be accepted, or commence one within said period and diligently prosecute the work on it, accompanied by notice of intention to refuse to receive further payment of rentals and declare forfeiture of the lease for failure to drill the same. The court considered that case with unusual care (Stanley v. United Fuel & Gas Co., supra), and the rule announced appears to be supported by sound reasoning; but, on

account of the great importance of the question, we do not feel disposed to adopt it until the question has been briefed and argued, and the opportunity is afforded for full consideration thereof in the light of our own decisions. For reasons which will presently appear, it is unnecessary to determine the question in this case. While the West Virginia court held that, under the circumstances stated, an implied condition to drill offset wells would thereupon arise, except for the consequences following a breach thereof in that jurisdiction, the obligation might as well have been termed an implied covenant.

Assuming, without deciding, that an obligation, either in the nature of an implied covenant or an implied condition to thereafter protect the premises against drainage, can be imposed by making demand and giving notice, as was done by the lessors on June 14, 1912, and that for breach of such obligation a forfeiture or cancellation of the lease may be decreed, the obligation certainly cannot be imposed or held to arise against permitting any drainage at all, however slight. Obviously, there must be actual or threatened drainage in a substantial sense. Hall v. So. Penn. Oil Co., 71 W. Va. 82, 76 S. E. 124. No obligation to drill an offset well should be imposed on the lessee which would probably result in a loss to him, and where the lessor suffers no substantial pecuniary loss by such drainage. The rule announced by the courts is even more favorable to the lessee than that. In Brewster v. Lanyon Zinc Co., supra, speaking of breach of an implied covenant to fully develop the premises and protect against drainage by the exercise of reasonable diligence, the court said:

"No breach can occur save where the absence of such diligence is both certain and substantial, in view of the actual circumstances at the time, as distinguished from mere expectations on the part of the lessor and conjecture on the part of the mining enthusiasts. The large expense incident to the work of exploration and development, and the fact that the lessee must bear the loss if the operations are not successful, require that he proceed with due regard to his own interests as well as those of the lessor. No obligation rests on him to carry the operations beyond the point where they will be profitable to him, even if some benefit to the lessor will result from them. It is only to the end that the oil and gas shall be extracted with benefit or profit to both that reasonable diligence is required. * * * Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, is what is required."

Let us consider the circumstances in evidence here. It must be borne in mind that, for reasons already given, the lessors waived any right to relief for drainage suffered prior to June 14, 1912, and it is only necessary to consider the circumstances as they existed at and subsequent to that time. The well, which it was demanded that the lessee should offset, was drilled by the Prairie Oil & Gas Company on a tract adjoining plaintiff's land. Neither plaintiff nor defendant had any interest in that tract or the product of the well. That well was located about 200 feet from the boundary line of plaintiff's land. It was completed in the latter part of December, 1910, and during the month of June, 1912, produced net only 60 barrels of oil, and had produced only about that amount for several months prior thereto. In July, 1912, the well was not operated, or at least it was not shown that there was any production therefrom. The net production for the subsequent months was as follows: August, 1912, 44 barrels; September, 1912, 22 barrels; October, 1912, 29 barrels; November, 1912, 46 barrels; December, 1912, 43 barrels; January, 1913, 9 barrels; February, 1913, 41 barrels; March, 1913, 45 barrels. In April, 1913, the gross production was 52 barrels; in May, 1913, 47 barrels; and during the week ending June 7, 1913, it produced gross 10 barrels. There was evidence that this well would drain oil from the adjacent property, the extent to which it would do so depending to a certain degree on the oil sand. It further appears from the evidence that it would cost between $4,500 and $5,000 to drill and equip an offset to this well. The price of oil is not clearly shown, but it is inferred from the evidence that at the time the well on the adjoining premises was completed it was about 40 cents a barrel; that in June, 1912, it was 60 cents a barrel, or a little more; and that the price steadily advanced until it reached 88 cents in December, 1912, which price was maintained until the time of trial.

It further appears from the evidence that considering the cost of drilling and operating this well, and the production that had been obtained, and the probable production therefrom, said well was not a paying well; and, further, that in view of the conditions prevailing during the year 1912, and at the time of the trial, a reasonably prudent oil operator, in the exercise of ordinary business judgment, would not have drilled a well to offset the same; and, further, that, while it was possible that a paying offset well might be drilled, yet it was not at all likely that such would be the case. There was no evidence that an offset well would be profitable to the lessee, or any facts from

which it could be reasonably inferred that operators of ordinary prudence, having regard for the interest of both lessor and lessee, would have drilled the same. Furthermore, it does not appear from the evidence that the oil which was being drained from the lessor's land and which could have been saved by operating an offset well, would have paid the lessor sufficient royalty or bonus to equal the amounts due them for delay. Under the terms of the lease, they were entitled to payments of $20 for each period of three months the completion of a well was delayed, but those payments would have ceased upon the completion of a well. While it is not possible to ascertain how much of the oil that was produced by the well on the adjoining premises was drained from the lessor's land, yet it is not unreasonable to infer that it did not exceed one-half. If the value of the lessor's royalty interest and bonus of one-fourth of the working interest from the 1st of July 1912, to the date of the trial, be calculated at 88 cents per barrel upon the oil so drained, it will be found to be less than the payments due them for delay during that period. Even if it be assumed that the entire production was drained from lessor's land the value of their interest therein would have been but little in excess of the payments for delay. Whatever may have been the obligation of the lessee to protect the premises against drainage, under these circumstances it surely cannot be said that there was drainage in a substantial sense, that the obligation to prevent same by drilling an offset arose and it would · be most unreasonable to decree a cancellation or forfeiture under the conditions disclosed by the evidence. If the trial court determined that the lessee should have drilled an offset under these circumstances, and the decree of cancellation was on that ground, the judgment is clearly against the weight of the evidence.

The judgment of the trial court is therefore reversed, and the cause remanded for further proceedings not inconsistent with the views herein expressed.

All the Justices concur, except TURNER, J., who dissents.